IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| C.A., by and through his parents and next friends, Charlsie and Jeffrey A., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION NO. 6:11-CV-00119 |
| THOMAS SUEHS, in his official capacity as EXECUTIVE COMMISSIONER OF THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION, | § § § § § | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendant. | § § § | |

Plaintiff C.A., by and through his parents and next friends, Charlsie A. and Jeffrey A., respectfully files this Original Complaint for declaratory and injunctive relief, and allege as follows:

## INTRODUCTION

1.     C.A. is a four and a half year old boy who has been diagnosed with cerebral palsy, a chronic neurological condition that permanently affects body movement and muscle coordination.  As a result of C.A.'s disabilities and health conditions, he cannot crawl, stand, or ambulate (walk) independently, and he cannot self-propel a manual wheelchair.  Therefore, C.A. has a medical need for a power wheelchair for independent mobility.

2.     C.A. is an eligible Medicaid beneficiary who is entitled to all medically necessary services, including durable medical equipment, under the Early and Periodic Screening, Diagnosis, and Treatment ("EPSDT") program for Medicaid beneficiaries under the age of twenty-one.  A power wheelchair is considered durable medical equipment.

3.      Defendant Thomas Suehs, the Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"), oversees the Texas Medicaid program.

4.      For more than two years, C.A. has repeatedly requested prior authorization for a power wheelchair from Texas Medicaid.  Despite C.A.'s entitlement to and well-documented medical need for the requested equipment, Defendant Suehs, acting in his official capacity, has repeatedly unlawfully denied C.A. the durable medical equipment to which he is entitled.

5.      Defendant's repeated failure and refusal to authorize the durable medical equipment requested by C.A. violates the EPSDT provision of Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*. ("the Medicaid Act"), which requires that beneficiaries under the age of twenty-one receive all medically necessary services.  As Executive Commissioner of the Texas Health and Human Services Commission, Defendant Suehs is ultimately responsible for ensuring that the operation of the Texas Medicaid program fully complies with the Medicaid Act and its implementing regulations.

6.      Independent powered mobility for C.A. will not only enable him to independently ambulate, but will also facilitate social and education integration, improve his psycho-social development, and enable him to grow to become a productive and integrated member of society. Without independent mobility, C.A. may develop learned helplessness, and experience delays in both physical and cognitive domains.

7.      Plaintiff seeks declaratory and injunctive relief to end Defendants' unlawful policies and practices.

## JURISDICTION AND VENUE

8.      This civil action is authorized by 42 U.S.C. § 1983 to redress the deprivation under color of law of rights guaranteed by the Medicaid Act.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

9.      This Court has authority to grant Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10.      Venue is proper in the United States District Court for the Eastern District of Texas, pursuant to 28 U.S.C. § 1391(b), because a substantive part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

11.      C.A. is a four and half year old boy with disabilities and an eligible Medicaid beneficiary.  This action is brought by his parents and next friends, Charlsie A. and Jeffrey A. C.A. resides with his parents in Lindale, Smith County, Texas, which is where he receives his Medicaid-funded services.

12.      Defendant Thomas Suehs is the Executive Commissioner of the Texas Health and Human Services Commission, the single state agency for the Texas Medicaid program.  42 U.S.C. § 1396a(5).  Defendant Suehs is sued solely in his official capacity, and may be served process at the Texas Health and Human Services Commission, 4900 North Lamar, 4th Floor, Austin, Texas 78751, with summons and a copy of the Complaint attached thereto.

## LEGAL FRAMEWORK OF THE MEDICAID PROGRAM

13.     In 1965, Congress enacted Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* ("the Medicaid Act"), establishing the Medicaid program, a voluntary, cooperative, federal-state program designed to provide necessary medical services to eligible beneficiaries. Texas elected to participate in the Medicaid program in 1967.

14.     As stated in the Medicaid Act, the purpose of the program is to enable states "to furnish . . . rehabilitation and other services to help such families and individuals attain or retain the capacity for independence or self-care." 42 U.S.C. § 1396-1.  To achieve this purpose, states are required to administer their Medicaid programs "in the best interests of the recipients."  42 U.S.C. § 1396a(a)(19).

15.     States that participate in the Medicaid program receive matching funds called federal financial participation ("FFP") for the health care it provides to eligible beneficiaries.  To receive FFP, states must adhere to the federal requirements found in the Medicaid Act and its implementing regulations.  42 U.S.C. § 1396a *et seq.*; 42 C.F.R. § 430 *et seq.*

16.     Pursuant to these requirements, Texas has developed a state plan that identifies the broad categories of required and optional medical services that are part of the Texas Medicaid program.  Under the provisions of the Medicaid Act, Texas's Medicaid plan must provide the following required services: inpatient and outpatient hospital services; other laboratory services and x-rays; nursing facility services; home health services (including durable medical equipment); early and periodic screening, diagnostic and treatment services (EPSDT) for beneficiaries under age twenty-one; physicians services; nurse-midwife services; and certified pediatric and nurse practitioner services.  42 U.S.C. § 1396a; 42 C.F.R. § 440.210.

17.     In addition to the required services that must be included in the Medicaid state plan, Texas Medicaid can choose from a list of over thirty (30) optional services to include in its state plan.  Examples of these optional services include: private duty nursing services; dental services; physical therapy; occupational therapy; services for individuals with speech, hearing and language disorders; case management services; and personal care services.  42 U.S.C. § 1396(d)(a); 42 C.F.R. § 440, *et seq.*

18.     To further comply with the Medicaid Act, Texas Medicaid must set reasonable standards in the operation of its program.  42 U.S.C. § 1396a(a)(17).

19.     Moreover, each service within the Medicaid state plan must be sufficient in amount, duration, and scope to reasonably achieve its purpose and services may not be arbitrarily denied or reduced in amount, duration, and scope because of the diagnosis, type of illness, or condition of an eligible beneficiary.  42 C.F.R. §§ 440.230(b) and (c).

20.     Texas, as part of its state plan, must also establish or designate a single state agency to administer or supervise the administration of the state plan.  42 U.S.C. § 1396a.  The Texas Health and Human Services Commission is the agency that was designated to be the single state agency to administer or supervise the administration of the state plan.

**Medicaid Services for Beneficiaries under the Age of Twenty-one**

21.     In 1990, the Medicaid Act was amended to clarify the scope of services available under the EPSDT benefit, a required category of service for beneficiaries under the age of twenty-one.  This amendment requires Texas Medicaid to provide "such other necessary health care, diagnostic services, treatment . . . to correct or ameliorate defects and physical and mental illnesses and conditions . . . ."  42 U.S.C. § 1396d(r)(5).

22.     Under the EPSDT benefit, which Texas Medicaid calls "Texas Health Steps," Texas Medicaid is required to provide all optional and required categories of service under the Medicaid Act to beneficiaries under the age of twenty-one when such treatment or service is found to be medically necessary, that is, when the treatment or service corrects or ameliorates the beneficiary's physical or mental illnesses or conditions.   42 U.S.C. §§ 1396a(a)(10)(A), 1396d(r)(5).

23.     Texas Medicaid administers the "treatment" part of the EPSDT benefit under a program it calls the "Comprehensive Care Program" ("CCP").

24.     To obtain most CCP services, the Medicaid beneficiary's treating physician must prescribe the service and attest to the beneficiary's medical need for the service.

25.     Some CCP services require prior authorization (that is, Texas Medicaid must approve or authorize the service before it can be provided to the beneficiary).  The Texas Health and Human Services Commission has contracted with the Texas Medicaid & Healthcare Partnership ("TMHP") to make prior authorization determinations for requests for certain items of durable medical equipment, including power wheelchairs.  When TMHP employees make prior authorization determinations, they review paperwork submitted by the beneficiary's treating health care professionals—they do not personally or physically assess the beneficiary or his medical needs.

26.     HHSC, as the single state agency that administers or supervises the administration of the Texas Medicaid program, is legally responsible for all Medicaid prior authorization determinations made by its contractor TMHP.

27.     Durable medical equipment ("DME") is a category of medical assistance that states must provide to eligible EPSDT beneficiaries when such equipment is medically

necessary, that is, when the equipment corrects or ameliorates the beneficiary's physical or mental illnesses or conditions.  42 U.S.C. § 1396d(r).

28.     While the federal regulations do not define DME, Texas has defined it in its administrative code as "[m]achinery and/or equipment which meets one or both of the following criteria: (A) the projected term of use is more than one year, or (B) reimbursement is made at a cost [of] more than $1,000." 1 TEX. ADMIN. CODE § 354.1031(b)(12)(A) & (B). The DME must be "medically necessary and the appropriateness of the health care service, supply, equipment, or appliance prescribed by the physician for the treatment of the individual recipient and delivered in his place of residence must be documented in the plan of care and/or the request form" and "meet the recipient's existing treatment and medical needs." 1 TEX. ADMIN. CODE § 354.1039(a)(4)(A)(1)(i), (iii).

## STATEMENT OF FACTS

### C.A.'s Medical Need for Powered Mobility

29.     C.A. is a four and a half year old boy who has been diagnosed with cerebral palsy. Cerebral palsy is a chronic neurological condition that permanently affects body movement and muscle coordination.

30.     Due to his cerebral palsy, C.A. cannot crawl, stand, or walk independently, and he cannot self-propel a manual wheelchair.  Thus, to achieve independent mobility, C.A. requires the use of a power wheelchair.

31.     As such, for the past two years, C.A. has been requesting prior authorization from Texas Medicaid for a power wheelchair with two main accessories or features: a power seat elevation system and an attendant control.   The power seat elevation system allows the wheelchair's seat to be raised and lowered, which will allow C.A. to, among other things, reach

the bathroom counter, where he can brush his teeth and hair, see in the mirror, and wash his face; reach the kitchen counter, where he can reach bowls, cups, and utensils; and reach dresser drawers so that he can choose and get his own clothes.  The requested power seat elevation system can also lower the seat all the way to the floor, which will allow C.A. to independently access the floor for play and group time in school.  The attendant control is a safety feature that would allow his parents or caregivers to operate (e.g., stop) the wheelchair should the need ever arise.  C.A.'s physical therapist describes the request for an attendant control this way: "no one would allow a three year old to walk across the street without holding the hand of an adult," and the "attendant control is the equivalent of holding this child's hand . . . ."

32.     C.A. participates in physical therapy and has successfully operated a (loaner) power wheelchair during physical therapy sessions.

**Texas Medicaid's Repeated Denial of Services to C.A.**

33.     Texas Medicaid has been denying C.A.'s requests for a power wheelchair for more than two years.

34.     C.A.'s durable medical equipment supplier, United Rehab Specialists, submitted C.A.'s first request to Defendant's contractor, TMHP, for prior authorization of a power wheelchair with an attendant control on or about November 14, 2008.

35.     C.A.'s November 2008 request included all of the forms and information required by Texas Medicaid's policies and procedures, including the Title XIX form, in which C.A.'s treating physician attested to the medical need of the requested equipment, and the Seating Assessment form, in which C.A.'s physical therapist also attested to the medical need of the requested power wheelchair.  C.A.'s physical therapist, Kristi Smith, who is a board certified specialist in pediatric physical therapy, has worked with C.A. since he was about nine months

old.  Ms. Smith explained to TMHP that C.A. needs a power wheelchair for independent mobility because he is unable to self-propel a manual wheelchair due to his disabilities and health conditions.  In response to the Seating Assessment form's question as to whether C.A. was "physically and mentally capable of operating [a] power wheelchair safely and with respect to others," Ms. Smith answered "Yes."

36.     Despite the submission of the required forms and the written attestation of medical need from C.A.'s treating physician and physical therapist, TMHP, on or about December 19, 2008, notified C.A. that it was denying his request for a power wheelchair and attendant control.

37.     About eight months later, on or about August 19, 2009, C.A. again attempted to get prior authorization from TMHP for a power wheelchair with an attendant control.  This time C.A. also requested a power seat elevation system for the wheelchair.  Again, C.A.'s durable medical equipment provider, United Rehab Specialists, submitted all of the forms and information required by Texas Medicaid's policies and procedures, including the Title XIX form, in which C.A.'s treating physician again attested to the medical need for the requested equipment, and the Seating Assessment form, in which C.A.'s physical therapist yet again attested to the medical need of the requested power wheelchair and accessories.  C.A.'s physical therapist again explained that C.A. is non-ambulatory, cannot self-propel a manual wheelchair, and is indeed "physically and mentally capable of operating [a] power wheelchair safely and with respect to others."

38.     On or about August 24, 2009, in response to C.A.'s August 19, 2009 request for a power wheelchair and accessories and the attestations of medical need by C.A.'s treating physician and physical therapist, TMHP sought additional information from United Rehab

Specialists.  TMHP asked if "a trial [had] been done with this client with this wheelchair," and "what were the results of that trial"; TMHP also asked for additional support for "why the client requires the powered seating elevation system," and for "medical necessity for the attendant control"; TMHP also asked "[i]s the client able to maneuver the wheelchair with the head array?"

39.     In response, on or about August 24, 2009, United Rehab Specialists submitted to TMHP a four-page letter of medical necessity signed by C.A.'s treating physician, Dr. Richard Rogers, who has treated C.A. since he was born.  In his letter dated August 23, 2009, Dr. Rogers explained that C.A. is "extremely bright," has cerebral palsy, and that he also "presents with movement dysfunction that impairs his ability to crawl, stand, or ambulate and limits his ability to functionally propel any type of manual wheelchair for any distance."  Dr. Rogers continued that C.A. "currently relies on his parents to push him in an adaptive stroller that provides him with no means of independent mobility," which is why Dr. Rogers was ordering the power wheelchair.  Dr. Rogers not only provided justification for the power wheelchair, but for each requested accessory.  Dr. Rogers explained that the power seat elevation system would "assist with independent wheelchair to floor transfers and allow lateral transfers in and out of bed," and that "this feature is essential in [C.A.'s] quest to achieve independent transfers and household performance of Mobility Related Activities of Daily Living."  Dr. Rogers concluded that the "provision of this wheelchair is consistent for patients with C.A.'s medical condition and is in the standards of good medical practice," and "is not for his convenience."  Dr. Rogers advised TMHP to "please phone my office with any questions regarding this patient."

40.     On or about August 27, 2009, TMHP again notified United Rehab Specialists that still more information was needed, namely, whether a trial was done with the wheelchair and

whether C.A. "is able to independently maneuver the wheelchair with the head array," and "detailed medical necessity . . . for the attendant control."

41.     Four days later, on or about September 1, 2009, TMHP notified C.A. that his request for a power wheelchair with a power seat elevation system and an attendant control could not be considered because it had not received "complete information" from United Rehab Specialists.  TMHP's notice to C.A., however, did not specify or identify what information was missing.

42.      On or about September 2, 2009, in response to TMHP's request for additional information, United Rehab Specialists provided TMHP with a statement from C.A.'s physical therapist.

43.     In her statement, Kristi Smith explained that C.A. had had two 45 minute trials with a power wheelchair, at which time he "demonstrated the ability to perform pwr [power] mobility operation with head controls with minimal supervision."  Ms. Smith continued that C.A. "most definitely has the cognitive ability to learn to be independent with a head array and external switches for changing modes to reverse and for power seat lift."

44.     Ms. Smith explained C.A.'s request for an "attendant control" as a safety feature, which any three and a half year old child would require.  Ms. Smith used the example that "no one would allow a three year old to walk across the street without holding the hand of an adult," and the "attendant control is the equivalent of holding this child's hand, otherwise he will be able to independently control and propel his power wheelchair."

45.     As for the power seat elevation system, Ms. Smith explained that it "will be used to allow [C.A.] access to the floor," which will "allow him to perform as his peers . . . ."  Ms. Smith continued that "while in school all peer group time is performed sitting on the floor," and

the only wheelchair with this function is the requested (group 5) wheelchair.  "[C.A.] is unable to sit on the floor without support and is unable to transfer himself from a seat height to the floor without max[imum] assist[ance][, but] with the use of the seat lift he will be able to transfer himself to/from floor to seat level independently."  Ms. Smith concluded that with the power seat elevation system, C.A. "will be able to move to the floor . . . [and] he will be indep[endent] with this transition to the floor."  Ms. Smith added that the power seat elevation system "will also allow [C.A.] to reach the bathroom counter and kitchen counters in his home to be able to perform necessary ADLs [activities of daily living] with increased independence."

46.    On or about September 2, 2009, TMHP notified United Rehab Specialists that it could not send C.A.'s request to medical review because it needed the correct billing code for the requested hip belt (an accessory for the wheelchair).  United Rehab Specialists provided TMHP with the required billing code the next day, on or about September 3, 2009.

47.    Despite the submission of the requested additional information from Ms. Smith and Dr. Rogers, TMHP, on or about September 15, 2009, again requested yet more information. This time, TMHP asked "in what settings will the client require the attendant control," and "how often will this be required," and "if the client will be able to perform independent transfers and activities of daily living with the seat functions requested?"

48.    Again, on or about September 17, 2009, and again on September 24, 2009, Ms. Smith responded, further explaining that the power seat elevation system has a floor to seat function, which is necessary "to allow [C.A.] access to the floor as this will allow him to perform as his peers," and that "while in school all peer group time is performed . . . sitting on the floor." Ms. Smith explained again that with the seat elevation system, C.A. "will be able to transfer to/from the floor to seat level independently."  Ms. Smith expounded on her previous discussion

of the benefits of the seat elevation system by adding that it would allow C.A. to reach the bathroom and kitchen counters so that he could perform necessary activities of daily living, including "teeth brushing, hair brushing, [and] face washing," and "access to kitchen items such as a cup, spoon, bowl, etc. with increased independence."

49.     As for TMHP's questions about the attendant control, Ms. Smith explained that the "attendant control will be utilized in all settings as the child will begin to use his power mobility system for all independent functional mobility," and that "the settings will include but not be limited to school, home, shopping, and community outings."  Ms. Smith explained that how often the attendant control might be used "will be determined by the need of the child, who is an individual as are all 3 [year old] children."

50.     In addition to explaining C.A.'s medical need for a seat elevation system and attendant control, Ms. Smith also provided TMHP with yet another benefit of the requested power wheelchair: C.A. was receiving a speech generating device (to be used for all of his communication), and that the device will interface with his power wheelchair, thereby giving C.A. the ability to transport his communication device and "be independent with communication."

51.     Despite all of the additional information provided by Ms. Smith, TMHP again requested more information on or about September 29, 2009, such as "what ADLs will the client be able to perform with this wheelchair," and "how [will] the client . . . be able to move from the chair to the floor with the powered seat elevation system," and "will the client require assistance for those transfers . . . ."

52.     On or about October 5, 2009, Ms. Smith responded as before, that C.A. will be able to reach the bathroom sink "to increase his independence with retrieving and rinsing [his]

tooth brush, see the mirror to be able to clean his face, and reach clothing in drawers to be able to choose his own without utilizing [a] communication system." Ms. Smith again stated that with the power seat elevation system C.A. would also "be able to retrieve his own utensils for feeding to increase his self feeding with utensils." Ms. Smith also explained that "[C.A.] will be able to move to the floor in the power mobility system by activating a switch and lowering the seat all the way to the floor." Ms. Smith also explained yet again that with the power seat elevation system, C.A. "will be indep[endent] with this transition to the floor."

53.    In response to all of the submitted information, on or about October 9, 2009, TMHP notified C.A. that his request for a power wheelchair with attendant control and power seat elevation system was denied. TMHP's denial notice to C.A. stated that "You are able to bring your hand to your mouth, but need help with motor planning and movements such as brushing your teeth. However, the documentation does not show you will be able to do tasks such as brushing your teeth with this wheelchair." The denial notice added that "the information does not clearly show you will be able to pilot the power chair safely without help from another person," and "[b]ecause you are not able to use the chair without the help of another person, a medical need for this level of wheelchair has not been shown."

54.    In response to TMHP's October 9, 2009 denial, C.A.'s physical therapist provided still more information to TMHP on or about November 3, 2009, yet again explaining C.A.'s medical need for the requested wheelchair and accessories. In her two-page letter, Ms. Smith again explained that during C.A.'s two training sessions with a power wheelchair "[h]e has demonstrated the ability to perform power mobility with the use of head controls." Ms. Smith explained, yet again, that the attendant control "will be utilized for safety as any normally developing child at 3 yrs of age would require, for example. no one would allow a 3 yr old to

walk across a street without holding the hand of an adult," and that "the attendant control is the equivalent of holding this child's hand."   Ms. Smith again explained how the power seat elevation system would provide C.A. access to the floor so that he could be with his peers while in school, and how the wheelchair would allow him to independently transfer to the floor.   Ms Smith again explained how the power seat elevation system would also provide C.A. access to the bathroom and kitchen counters, where he could perform necessary activities of daily living such as brushing his hair and teeth, washing his face¸ getting a cup or bowl or spoon from the kitchen, and choosing his own clothes from drawers.   Ms. Smith added that with the seat elevation system and a modified toothbrush, C.A. will be able "to perform indep[endent] tooth brushing."   Ms. Smith again explained that C.A.'s communication device would interface with the power wheelchair, which is necessary for C.A. to use the device independently due to its weight and the need to attach it to something for access.   Finally, Ms. Smith concluded that in her "professional judgment, this power mobility system is the perfect fit and most adaptable power system that will allow this child to function with the most independence over the longest period of time."

55.     On or about November 5, 2009, however, despite all of information of medical necessity provided by C.A.'s treating physician and physical therapist, TMHP again denied C.A.'s request for a power wheelchair with a power seat elevation system and attendant control. In its November 5, 2009 notice to United Rehab Specialists, TMHP stated that it was denying the requested wheelchair and accessories because "[t]he client's high muscle tone makes it hard for the client to control his muscles and complete activities such as brushing his teeth and dressing without the help from another person," and that "the high muscle tone makes it hard for the client to use a power wheelchair safely without the help of another person."   TMHP concluded that

"[b]ecause the information sent does not show the client can use the power wheelchair without help of another person, the client does not have a medical need for a power wheelchair."

56.    Because C.A., due to his cerebral palsy and other health conditions, continued to have a medical need for a power wheelchair with an attendant control and power seat elevation system, Ms. Smith submitted an additional letter to TMHP on or about April 12, 2010.  In this letter, Ms. Smith again confirmed that "C.A. is extremely intelligent and has proven (through actual equipment trials and not speculation) that he can effectively manipulate and negotiate a power wheelchair safely and independently with the use of an electric head array as trialed."  Ms. Smith also again advised TMHP that "[a]lthough [C.A.] may require minimal assistance with his oral hygiene, the use of a power seat elevator would allow [C.A.] to physically participate in that MRADL [mobility-related activity of daily living] not to mention a multitude of other MRADLs that [C.A.] has yet been able to explore."

57.    About a week after receiving Ms. Smith's letter, TMHP, on or about April 20, 2010, again denied C.A.'s request for a power wheelchair with a power seat elevation system and attendant control.  This time, TMHP notified C.A. that:

> *The information sent states you can use your power wheelchair with a head array, and you do not need help from another person to use the head array. The custom power wheelchair will allow you to move in your environment without help from another person.* No information was sent showing a power seat elevation system and power seat-to-floor system will allow you to stand and transfer out of your wheelchair or transfer across unequal heights without help from another person. No information was sent showing a power seat elevation system will allow you to do activities such as meal preparation or grooming without help from another person. *Because you are able to use your power wheelchair without help from another person, and no information was sent showing the power seat elevation system and power seat-to-floor system will allow you to stand and transfer out of your wheelchair or transfer across unequal heights without help from another person, or do activities without help from another person, a medical need for an attendant control, a power seat elevation system, and a power seat-to-floor system has not been shown.* The wheelchair you have asked for only comes with the built-in power seat elevation system and power seat-to-floor system.  Because

you do not have a medical need for the power seat elevation system and power seat-to-floor system, and the power seat elevation system and power seat-to-floor system cannot be removed from the wheelchair, your request for a Permobil K450 custom power wheelchair with power tilt, power seat elevation system, and power seat-to-floor system cannot be approved.  (Emphasis added.)

58.     Thus, on or about April 20, 2010, even though TMHP had now found that C.A. was "able to use your power wheelchair without help from another person" (as his therapist had been telling TMHP since November 2008), TMHP still denied the requested power wheelchair because it concluded that none of the requested accessories—the attendant control and the power seat elevation system—were medically necessary.  TMHP allegedly denied the power seat elevation system because "no information was sent showing the power seat elevation system and power seat-to-floor system will allow you to stand and transfer out of your wheelchair or transfer across unequal heights without help from another person, or do activities without help from another person."  In its denial notice, TMHP failed or refused to acknowledge all of the information provided by C.A.'s physician and physical therapist about the numerous medical benefits of the power seat elevation system, such as allowing C.A. independent access to the floor for group time with his peers, and access to bathroom and kitchen counters, where he could brush his teeth and wash his face, and get a cup or a bowl and a spoon independently.  TMHP denied the attendant control because it found that C.A. was "able to use your power wheelchair without help from another person . . . ."  Of course, TMHP had previously denied the attendant control when it deemed C.A. was not able to use the power wheelchair without help from another person.

59.     Because of his continued need for a power wheelchair, C.A. again submitted to TMHP a request for a power wheelchair with a seat elevation system and attendant control on or about July 26, 2010.

60.     Despite again submitting all of the forms and information required by Texas Medicaid's policies and procedures, along with the attestations of medical need by C.A.'s treating physician and physical therapist for the requested wheelchair and accessories, TMHP notified United Rehab Specialists by letter on July 29, 2010, that yet still more information was needed.  In particular, TMHP asked

> What is the medical necessity for the power seat lift?  Does the client have the ability to stand or pivot transfer independently?  Does the client require assistance with transfers across unequal seat heights?  Does the client have limited reach and range of motion in the shoulder or hand that prohibits independent performance of mobility-related activities of daily living in the home?  What is the medical necessity for the floor to seat lift?  What is the medical necessity of the attendant control?  Is the client capable of operating the power wheelchair independently?

61.     TMHP asked whether C.A. was "capable of operating the power wheelchair independently," even though just three months earlier, in its April 20 notice, TMHP had found C.A. was "able to use [a] power wheelchair without help from another person."  And TMHP asked "what is the medical necessity of the seat lift," even though that question had already been answered at least seven times, on or about August 24, 2009, September 2, 2009, September 17, 2009, October 15, 2009, November 3, 2009, and April 12, 2010.

62.     In addition, on or about the same day it received TMHP's latest request for more information, July 29, 2010, United Rehab Specialists again submitted Kristi Smith's February 2010 letter, in which she had explained that C.A. had the ability to use head controls to operate all features of the wheelchair and that the attendant control was required for the same reasons one would hold the hand of any three year old child.

63.     On July 30, 2010, one day after requesting the additional information from United Rehab Specialists, TMHP again denied C.A.'s request for the power wheelchair as "incomplete," sending United Rehab Specialists a notice that "[t]he letter of medical necessity did not address

the client's ability to pivot transfer or transfer across surfaces." The notice also stated that "[i]t is also not clear that the power wheelchair will provide five years of growth." The notice concluded with an admonition that "[o]nce you obtain the missing information you will need to resubmit the entire request as a new request."

64. In further response to TMHP's questions from July 29, 2010, United Rehab Specialists faxed TMHP on or about August 3, 2010, another letter of medical necessity prepared by Ms. Smith, dated August 2, 2010, in which she explained that "[C.A.] is currently able to complete a stand pivot transfer with moderate assist, he has the potential to perform a stand pivot and or a sliding transfer from wc/chair to level surfaces with mod[erate] assist[ance] immediately and progressing with further training to min[imal] to SBA [stand-by assist] for all with use of pwc [power wheelchair] that can adjust to varying heights." Ms Smith also confirmed that the requested power wheelchair would "provide available growth to allow this child use of this device for up to 5 years."

65. On or about August 6, 2010, TMHP, despite never laying eyes on C.A. or speaking with his physician or physical therapist, again informed C.A. and his parents by letter that the requested power wheelchair and accessories were denied. This time, the denial notice stated that "no information was sent showing you are currently able to control the power wheelchair without help from another person"—even though such information had been repeatedly provided and TMHP had determined in April that C.A. was indeed "able to use your power wheelchair without help from another person." TMHP denied the power seat elevation system as well, concluding that because "the power seat elevation system will not allow you to stand and transfer out of your wheelchair or transfer across unequal heights without the help from another person, a medical need for the power wheelchair has not been shown." In its

notice, TMHP again failed to mention or acknowledge all of the submitted information that explained in detail the medical need and benefits of the power seat elevation system, such as allowing C.A. independent access to the floor for group time with his peers, and access to bathroom and kitchen counters, where he could brush his teeth and wash his face, and get a cup or bowl or spoon independently.

66.     Not giving up, as he continues to have cerebral palsy and thus a medical need for the requested power wheelchair and accessories, C.A., through counsel, on or about December 7, 2010, submitted to HHSC's counsel a DVD of C.A. independently operating a (loaner) power wheelchair in his physical therapist's office.

67.     Despite C.A.'s counsel's letter, and the video evidence of C.A. independently operating a power wheelchair, TMHP again denied C.A.'s request on or about December 21, 2010, stating that "[c]lient requires significant direction and supervision to operate the requested equipment as would be expected for age.  Client is not able to independently operate the pwc [power wheelchair].  Decision is unchanged, denied."  This final denial also failed to address the requested accessories: the power seat elevation system and attendant control.

68.     The requested power wheelchair with seat elevation system and attendant control meets both criteria of the Texas definition of durable medical equipment: the wheelchair will be used for 3-5 years, and it costs in excess of $1,000.  C.A.'s physical therapist and physician have both physically assessed C.A. and have attested to the wheelchair's medical necessity and appropriateness.

69.     As required by federal law, Defendant Suehs has failed or refused to ensure that TMHP is complying with the Medicaid Act when making prior authorization decisions concerning medically necessary durable medical equipment.  42 C.F.R §§ 438. 206, 348.210.

70.     Because of Defendant's denial of the requested equipment, C.A. has been denied independent mobility, necessarily decreasing his independence and thereby limiting his ability to participate fully in the world.  Defendant's denial of the requested equipment puts C.A. at risk for developing learned helplessness, experiencing delays in both physical and cognitive domains, and suffering a decrease in confidence and in participation with his peers in everyday activities.

**Benefits of Powered Mobility for Children**

71.     In 2008, RESNA, the Rehabilitative Engineering and Assistive Technology Society of North America, published its Position on the Application of Powered Wheelchairs for Pediatric Users.  RESNA found that "A child's ability to drive a motorized wheelchair is not related to chronological age; rather, it is related to cognitive readiness. Age appropriate supervision is natural and may be required for safety and to enhance learning."  RESNA explained that "To receive a power wheelchair, a child only needs to demonstrate emerging skills in each of these areas, not mastery. Mastery of these skills generally occurs only with actual driving experience, which is not possible to obtain unless a power wheelchair customized for the individual is consistently available."

72.     RESNA found that "Clinical experience shows that 11-12 month old children have the ability to operate a power wheelchair."  RESNA explained that "At 12-13 months children typically begin to walk. Therefore utilization of PM [powered mobility] at similar ages is also recommended for the appropriate children, to enable them to explore the environment and in turn continue to develop motor and cognitive skills."  RESNA stated the obvious: that "Young children using PM need to be supervised just like their non-disabled peers."

73.     RESNA stated that it was "its position that age, limited vision or cognition, behavioral issues, the ability to walk or propel a manual wheelchair short distances should not, in

and of themselves, be used as discriminatory factors against PM for children. RESNA recommends early utilization of Powered Mobility for the appropriate candidates as medically necessary, to promote psycho-social development, reduce learned helplessness, and to facilitate social and educational integration and independence."

74.     RESNA concluded that "Functional, independent mobility in children with disabilities has been shown to improve cognitive and perceptual skills, reduce learned helplessness, increase confidence and increase participation with their peers in everyday activities."

**CAUSE OF ACTION: THE MEDICAID ACT**

75.     Plaintiff restates and incorporates by reference each of the allegations in paragraphs 1 – 74, above.

76.     Defendant, by the actions or inactions set forth above, has violated and continues to violate Title XIX of the Social Security Act, 42 U.S.C. § 1396d(r)(5), and its implementing regulations by denying Plaintiff C.A. his entitlement to all medically necessary durable medical equipment.

77.     Defendant has unlawfully deprived Plaintiff C.A. of his entitlement to all medically necessary durable medical equipment by: (a) failing or refusing to apply the proper medical necessity criteria (i.e., does the requested equipment correct or ameliorate the beneficiary's defects and physical and mental illnesses and conditions), and (b) applying arbitrary and capricious medical necessity criteria (e.g., age, ability to stand and transfer independently).

78.     Plaintiff is or is in danger of suffering irreparable harm, and has no adequate remedy at law.

## ATTORNEY'S FEES

79.     Plaintiff is entitled to and seeks an award of his reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.     Assume jurisdiction of this action;

B.     Declare that Defendant's actions and inactions violate the Social Security Act;

C.     Issue preliminary and permanent injunctive relief enjoining Defendant from violating the Social Security Act and requiring Defendant to immediately provide or authorize all of the medically necessary services and durable medical equipment that Plaintiff requested and to which Plaintiff is entitled under the Medicaid program;

D.     Award Plaintiff his reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

E.     Grant such other and further relief as may be just, equitable and proper.

Respectfully submitted,


_____/s/ Peter Hofer_____
PETER HOFER
Texas Bar No. 09777275
DISABILITY RIGHTS TEXAS
7800 Shoal Creek Blvd., Suite 171-E
Austin, Texas 78757
(512) 454-4816
(512) 454-3999 Fax
Email: phofer@disabilityrightstx.org

MARYANN OVERATH
Texas Bar No. 00786851
TEXAS LEGAL SERVICES CENTER
7800 Shoal Creek Blvd., Suite 171-E
Austin, Texas 78757

(512) 587.1614
(512) 597.6143 Fax
Email: moverath@tlsc.org

ATTORNEYS FOR PLAINTIFF